**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| Malikie Innovations Ltd. and<br>Key Patent Innovations Ltd.<br><br>Plaintiffs,<br><br>v.<br><br>Foris DAX, Inc. d/b/a Crypto.com,<br>Foris DAX Asia Pte. Ltd., and<br>Foris Holdings KY Limited<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. ______________<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND

Plaintiffs Malikie Innovations Ltd. ("Malikie") and Key Patent Innovations Ltd. ("KPI") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint for patent infringement and damages against Defendants Foris DAX, Inc. d/b/a Crypto.com ("Foris DAX"), Foris DAX Asia Pte. Ltd. ("Foris DAX Asia"), and Foris Holdings KY Limited ("Foris Holdings") (collectively, "Defendants" or "Crypto.com") and, in support, allege the following:

## PARTIES

1. Malikie is the successor-in-interest to a substantial patent portfolio created and procured over many years by BlackBerry Ltd., formerly known as Research in Motion Ltd., and its predecessor, subsidiary, and affiliated companies (collectively, "BlackBerry"). Malikie is an Irish entity duly organized and existing under the laws of Ireland. Malikie has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

2. KPI is the beneficiary of a trust pursuant to which Malikie owns, holds, and asserts the Asserted Patents (set forth below). KPI is an Irish entity duly organized and existing under the

laws of Ireland. KPI has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

3. On information and belief, Defendant Foris DAX, Inc. is a corporation organized and existing under the laws of the State of Delaware, doing business as "Crypto.com," with its principal place of business and North America headquarters at 110 N. College Avenue, Suite 500, Tyler, Texas 75702, in this District.[1][2] Foris DAX has itself pleaded, in a civil action it filed in this District and Division, that it "is a corporation organized under the laws of the state of Delaware, with its headquarters in Tyler, Texas," and that "[i]t operates under the business name of Crypto.com."[3] Crypto.com's own newsroom states that its Washington, D.C. office "is the latest North America office for Crypto.com, following the establishment of its North America headquarters in Tyler, Texas in 2024."[4] The Texas Department of Banking has likewise identified "Foris DAX, Inc. (Foris DAX) of Tyler, Texas."[5]

4. On information and belief, Defendant Foris DAX Asia Pte. Ltd. is a private limited company organized and existing under the laws of the Republic of Singapore, trading as "Crypto.com," and is licensed by the Monetary Authority of Singapore as a Major Payment

[1] All URLs cited in this Complaint were last accessed on September 16, 2016 unless otherwise noted.

[2] *See* Crypto.com, Official Rules, U.S. Sweepstakes (identifying the "Sponsor" as "Foris DAX, Inc., Crypto.com, 110 N College Ave. Suite 500, Tyler TX 75702, United States"), https://crypto.com/document/app-giveaway-campaign-us-2026.

[3] *Foris DAX Inc. d/b/a Crypto.com v. U.S. Sec. & Exch. Comm'n*, No. 6:24-cv-00373 (E.D. Tex. Tyler Div., filed Oct. 8, 2024), Dkt. 1 at ¶ 36,

[4] Crypto.com, Crypto.com Announces Washington, D.C. Office (May 7, 2025), https://crypto.com/en/company-news/cryptocom-announces-washington-dc-office.

[5] Tex. Dep't of Banking, Press Release (May 7, 2025), https://www.dob.texas.gov/sites/default/files/files/news/press-releases/2025/05-07-25bpr.pdf.

Institution providing digital payment token services. On information and belief, Foris DAX Asia is not a resident of any judicial district within the United States.

5. On information and belief, Defendant Foris Holdings KY Limited is an exempted company organized and existing under the laws of the Cayman Islands and is the top-level holding company of the Crypto.com group of companies. In an August 25, 2025 business combination agreement filed with the U.S. Securities and Exchange Commission, "Foris Holdings KY Limited, a Cayman Islands exempted company," is defined as "Crypto.com."[6] On information and belief, Foris Holdings is not a resident of any judicial district within the United States.

6. On information and belief, Defendants own, operate, and control the Crypto.com platform, including the website located at https://crypto.com/, the Crypto.com Exchange located at https://crypto.com/exchange, and the Crypto.com mobile applications distributed through the Apple App Store and Google Play, including the Crypto.com App, the Crypto.com Exchange app, the Crypto.com Onchain (formerly DeFi Wallet) app, and the Crypto.com Pay for Business app.

## NATURE OF THE ACTION

7. This is a civil action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

8. This case centers on ground-breaking innovations in elliptic curve cryptography and secure messaging that were discovered by some of the field's leading technologists at Certicom Corporation and BlackBerry Limited (formerly known as Research In Motion, or "RIM"), that years later were recognized and selected by the designers of Bitcoin—far and away the world's most valuable cryptocurrency—to enable Bitcoin's characteristic quality as a "trustless" payment

[6] Business Combination Agreement, Ex. 2.1 (Aug. 25, 2025), https://www.sec.gov/Archives/edgar/data/2064658/000110465925083153/tm2524365d3_ex2-1.htm.

system requiring no third party intermediary.[7] Numerous cryptocurrencies, including Bitcoin (BTC), Ethereum (ETH), Tether (USDT), USD Coin (USDC), Binance Coin (BNB), XRP (XRP), Litecoin (LTC), Bitcoin Cash (BCH), Ethereum Classic (ETC), Dogecoin (DOGE), Zcash (ZEC), and Crypto.com's Coin (CRO), incorporate cryptographic technology developed and patented by Certicom and BlackBerry—technology covered by the Asserted Patents. Defendants, in turn, use this patented technology to operate one of the largest cryptocurrency exchanges and digital wallet platforms in the world, to provide custodial services and transfer their customers' digital assets, to secure the communication links over which those transactions travel, and to engage in cryptocurrency transactions.

9. Malikie is the assignee of and owns all right and title to U.S. Patent Nos. 8,806,197 (the "'197 Patent"); 8,532,286 (the "'286 Patent"); 8,331,557 (the "'557 Patent"); and 9,143,323 (the "'323 Patent") (collectively, the "Asserted Patents"), which were duly and legally issued by the United States Patent and Trademark Office ("USPTO"). Malikie seeks monetary damages and, where appropriate, injunctive relief.

---

[7] As used herein, "Bitcoin" with a capital "B" refers to Bitcoin's protocol, network, and blockchain, whereas "bitcoin" with a lower case "b" refers to the unit of cryptocurrency.

## FACTS COMMON TO ALL CLAIMS

### Background

#### *The Rise of Cryptocurrencies*

10. In 2025, the price of a single bitcoin (1 BTC[8]) surpassed $126,000.[9] While that is an impressive figure in absolute terms, it is even more impressive considering how much the value of bitcoin has increased over the years. When today's leading U.S.-based cryptocurrency exchange was founded in 2012, "a bitcoin was worth $6 and only known by a few nerds on the internet."[10] Just two years prior to that, 1 BTC was worth less than a penny: $0.0041. On May 22, 2010, in what is widely understood to be the first commercial Bitcoin transaction, Laszlo Hanyecz (one of Bitcoin's earliest developers and proponents) paid 10,000 BTC—worth about $41 at the time—for two Papa John's pizzas.[11] And only seven months before that, 1 BTC was worth just $0.00099. In the first ever exchange of bitcoin for U.S. dollars, Martti Malmi (Bitcoin's second developer after Satoshi Nakamoto) sold 5,050 BTC for $5.02 on October 12, 2009.[12] Following the meteoric rise of Bitcoin, had they kept them, Hanyecz's 10,000 BTC would have been worth over $1.26 billion in October 2025 and Malmi's 5,050 BTC would have been worth over $636 million. No other cryptocurrency has attained such incredible value.

---

[8] "BTC" is a common unit used to designate one bitcoin. *See* https://bitcoin.org/en/vocabulary#btc. Bitcoin can be transacted in units smaller than 1 BTC, in units of "satoshi," which is the smallest unit of bitcoin, equivalent to a one hundred millionth of a single bitcoin (0.00000001 BTC). *See* https://en.bitcoin.it/wiki/Satoshi_(unit).

[9] https://www.coinbase.com/price/bitcoin.

[10] https://www.cnbc.com/2021/04/14/coinbase-co-founders-launched-when-a-bitcoin-btc-was-worth-6.html (quoting Fred Ehrsam, co-founder of Coinbase).

[11] https://www.youtube.com/watch?v=tWU3O3X5kKE; https://www.coinbase.com/learn/crypto-glossary/what-is-bitcoin-pizza.

[12] https://bitcoinmagazine.com/markets/bitcoins-first-trade-now-worth-130-million.

11. Bitcoin is regarded as the first "cryptocurrency" and "remains by far the biggest, most influential, and best-known."[13] Other leading cryptocurrencies today include Ethereum, Tether, and Solana, which, although they are perhaps relatively well-known among those familiar with cryptocurrency, are worth orders of magnitude less than Bitcoin.[14] Thousands of cryptocurrencies exist today[15], but, as the Ethereum website acknowledges, "[i]t all started with bitcoin."[16]

12. While Bitcoin is the foundation of today's sprawling cryptocurrency market, the foundation of Bitcoin's trailblazing trustless digital currency model—its digital signature framework—uses cryptographic technology developed and patented by Certicom and BlackBerry.[17] Bitcoin's adoption of this technology set a trend that has propagated throughout the cryptocurrency landscape.[18]

***Cryptocurrency's Foundation is Certicom-Developed Cryptography***

13. The creation of Bitcoin is attributed to Satoshi Nakamoto ("Satoshi"), the presumed pseudonym used by the author[19] of a white paper titled "Bitcoin: A Peer-to-Peer Electronic Cash System," which was reportedly sent on October 31, 2008 to a small group of recipients on "The

---

[13] https://www.coinbase.com/learn/crypto-basics/what-is-cryptocurrency.

[14] *See e.g. id.*; https://coinmarketcap.com/.

[15] For example, the Coinbase exchange lists hundreds of tradable crypto assets among thousands in existence. https://www.coinbase.com/explore.

[16] https://web.archive.org/web/20241216232605/https://ethereum.org/en/what-is-ethereum/ (answering "What is a cryptocurrency?").

[17] https://bitcoin.org/bitcoin.pdf ("Bitcoin Whitepaper") at 1, 2, 8.

[18] https://bitcoin.org/en/vocabulary#mining

[19] Satoshi Nakamoto might be one or more persons. *See e.g.* https://www.metzdowd.com/pipermail/cryptography/2008-October/014810.html ("I've been working on a new electronic cash system…."); *id.* ("We propose a solution to the double spending problem….").

Cryptography Mailing List" using a pipermail message service hosted by metzdowd.com.[20] Satoshi's message included a link to the white paper, which was (and still is) hosted at bitcoin.org, a site "originally registered and owned by Bitcoin's first two developers, Satoshi Nakamoto and Martti Malmi."[21]

14. The first line of Satoshi's initial message to the "cryptography" community articulated the goal of Bitcoin: to provide "a new electronic cash system that's fully peer-to-peer, with no trusted third party."[22] This defining characteristic of Bitcoin is achieved using cryptography.[23] Specifically, "[d]igital signatures provide part of the solution."[24] As Satoshi explained in a February 11, 2009 message to another online community—the "p2p-research" mailing list—"[o]ne of the fundamental building blocks for such a system [as Bitcoin] is digital signatures."[25]

15. A digital signature is a cryptographic tool for verifying the authenticity of digital data (*i.e.*, validating its original source and genuineness) and its integrity (*i.e.*, that it is accurate, complete, and has not been tampered with).[26] In fact, a bitcoin is fundamentally just "a chain of digital signatures" recorded in a public history or "chain" of transactions. *See* Bitcoin Whitepaper

---

[20] *See* Bitcoin Whitepaper; *see also* https://www.wired.com/story/after-10-years-bitcoin-changed-everything-nothing/.

[21] https://bitcoin.org/en/about-us#own; https://www.metzdowd.com/pipermail/cryptography/2008-October/014810.html.

[22] https://www.metzdowd.com/pipermail/cryptography/2008-October/014810.html; *see also* Bitcoin Whitepaper (abstract).

[23] Bitcoin Whitepaper at 1 ("What is needed is an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party.").

[24] https://www.metzdowd.com/pipermail/cryptography/2008-October/014810.html (abstract); Bitcoin Whitepaper (abstract).

[25] https://satoshi.nakamotoinstitute.org/emails/p2p-research/35/.

[26] https://www.cisa.gov/news-events/news/understanding-digital-signatures.

at 2 ("We define an electronic coin as a chain of digital signatures. Each owner transfers the coin to the next by digitally signing a hash of the previous transaction and the public key of the next owner and adding these to the end of the coin."), 8 (describing "a peer-to-peer network using proof-of-work to record a public history of transactions").

**2. Transactions**

We define an electronic coin as a chain of digital signatures. Each owner transfers the coin to the next by digitally signing a hash of the previous transaction and the public key of the next owner and adding these to the end of the coin. A payee can verify the signatures to verify the chain of ownership.




Bitcoin Whitepaper at 2

*See also* https://satoshi.nakamotoinstitute.org/emails/p2p-research/35/ ("A digital coin contains the public key of its owner. To transfer it, the owner signs the coin together with the public key of the next owner. Anyone can check the signatures to verify the chain of ownership"). Specifically, as Satoshi explained to the "cryptography" community shortly after releasing the white paper but before releasing the first version of Bitcoin software, "it's ECC digital signatures."[27]

16. The acronym "ECC" stands for elliptic curve cryptography.[28] ECC "represents a different way to do public-key cryptography—an alternative to the older RSA system—and also

[27] https://satoshi.nakamotoinstitute.org/emails/cryptography/14/; *see also* https://satoshi.nakamotoinstitute.org/emails/cryptography/2/ (explaining that "ECC is nicely compact").

[28] https://en.bitcoin.it/wiki/Elliptic_curve_cryptography.

offers certain advantages."[29] "ECC devices require less storage, less power, less memory, and less bandwidth than other systems. This allows you to implement cryptography in platforms that are constrained, such as wireless devices, handheld computers, smart cards, and thin-clients. It also provides a big win in situations where efficiency is important."[30] As explained by Certicom Corporation, "the authority for strong, efficient cryptography," when asymmetric cryptography (such as public-key cryptography) is desired "Elliptic curve cryptography (ECC) is the best choice, because" it "will give you the most security per bit."[31] For example, "ECC offers considerably greater security for a given key size" and enables "faster cryptographic operations, running on smaller chips or more compact software" resulting in "less heat production and less power consumption."[32]

17. ECC is also secure. In 1997, Certicom introduced the "Elliptic Curve Cryptosystem (ECC) Challenge" as a way "to increase industry understanding and appreciation for the difficulty of the elliptic curve discrete logarithm problem, and to encourage and stimulate further research in the security analysis of elliptic curve cryptosystems."[33] Certicom challenged participants to compute the ECC private key from a list of ECC public keys and associated parameters.[34] The challenge included relatively easier (Level I) challenges, some of which have been solved, and more difficult (Level II) challenges, which Certicom believed to be "computationally infeasible" and still have not been solved.[35]

---

[29] https://www.certicom.com/content/certicom/en/the-basics-of-ecc.html.

[30] *Id.*

[31] https://www.certicom.com/content/dam/certicom/images/pdfs/WP-ECCprimer.pdf at 3, 22.

[32] *Id.* at 3.

[33] https://www.certicom.com/content/certicom/en/the-certicom-ecc-challenge.html.

[34] *Id.*

[35] *Id.*

18. As mentioned above, Bitcoin uses ECC digital signatures. Specifically, Bitcoin uses an elliptic curve digital signature algorithm ("ECDSA") with parameters known as "secp256k1."[36] Over 70 currently traded cryptocurrencies, including Bitcoin (BTC), Ethereum (ETH), Tether (USDT), USD Coin (USDC), Binance Coin (BNB), XRP (XRP), Litecoin (LTC), Bitcoin Cash (BCH), Ethereum Classic (ETC), Dogecoin (DOGE), Zcash (ZEC), and Crypto.com's Coin (CRO), use the secp256k1 parameters.[37] Secp256k1 is defined in a Standards for Efficient Cryptography (SEC) specification titled "SEC 2: Recommended Elliptic Curve Domain Parameters" (Version 2.0, Jan. 2010), which is a publication of the Standards for Efficient Cryptography Group (SECG).[38] The SEC 2 paper (Version 2.0) was generated by Certicom Research and identifies Dan Brown of Certicom as the main contact.[39] Dan Brown is a co-inventor of several of the Asserted Patents in this case. *See infra*.

19. Certicom—which was "[f]ounded in 1985, the same year Elliptic Curve Cryptography (ECC) was invented"—has long been regarded as the leader in ECC technology.[40] Indeed, Scott Vanstone, who co-founded Certicom in 1985 with Gord Agnew and Ron Mullin, was an internationally recognized top ECC researcher and the recipient of prestigious awards and recognitions for his monumental and profound contributions in the field of ECC.[41] Vanstone

---

[36] https://en.bitcoin.it/wiki/Elliptic_Curve_Digital_Signature_Algorithm; https://en.bitcoin.it/wiki/Secp256k1.

[37] https://ethanfast.com/top-crypto.html

[38] https://www.secg.org/sec2-v2.pdf at 9.

[39] *Id*. (cover page).

[40] https://www.certicom.com/content/certicom/en/about.html.

[41] *See e.g.*https://www.certicom.com/content/certicom/en/about/news/release/2004/certicom-founder-scott-vanstone-wins-prestigious-research-award.html; https://www.certicom.com/content/certicom/en/about/news/release/2009/certicom-founder-wins-premiers-catalyst-award-for-lifetime-achie.html; https://uwaterloo.ca/news/profound-impact-researcher.

authored numerous papers and was awarded hundreds of patents related to ECC.[42] To help drive ECC's commercial adoption, Certicom (with Vanstone) founded the SECG in 1998.[43] The purpose of the SECG is "to develop commercial standards that facilitate the adoption of efficient cryptography and interoperability across a wide range of computing platforms."[44] "SECG members include leading technology companies and key industry players in the information security industry," including its founding member, Certicom.[45] Certicom's development of a standards body to promote ECC was welcomed by many in the cryptography industry. As the chief scientist of one security firm put it in 1998, "It's good news for the industry as a whole to move ECC forward because it is a promising technology."[46] In 2004, a professor at Texas Tech University (winner of the Certicom Elliptic Curve Cryptography (ECC)2-109 Challenge) said, "I think public-key cryptography based on ECC is what we should and will be moving toward."[47] Walt Davis, former senior vice-president at Motorola, told Vanstone that he believed "ECC was the only technology that would work in their constrained environments."[48]

20. Demonstrating its position as the leader in developing and promoting ECC technology, Certicom hosted the annual ECC Conference beginning in 2004, which "was designed

---

[42] *See id.*

[43] https://www.cnet.com/tech/tech-industry/certicom-creates-standards-body/.

[44] https://www.secg.org/.

[45] *Id.*; *see also* https://www.certicom.com/content/certicom/en/about/news/release/2005/standards-for-efficient-cryptography-group--secg--announce-new-i.html (identifying Certicom as "a founding member of SECG").

[46] https://www.cnet.com/tech/tech-industry/certicom-creates-standards-body/.

[47] https://www.metzdowd.com/pipermail/cryptography/2004-April/006798.html.

[48] https://www.certicom.com/content/certicom/en/code-and-cipher/article/529-reflections-the-year-that-was-.html.

to interest both a technical audience and business managers."[49] Vanstone recalled that the 2004 conference "was well-attended by cryptography experts, industry leaders and members of the developer community."[50] The conference also "held significant historical value," with "luminaries such as Dr. Ralph Merkle, Dr. Neal Koblitz, Dr. Victor Miller and Dr. Walt Davis" in attendance.[51] Those luminaries were the pioneers of public key cryptography and ECC: Miller and Koblitz "independently invented elliptic curve cryptography"; Merkle was one of the inventors of public key cryptography; and Davis was a senior vice-president at Motorola who was an early advocate for ECC and recipient of the first ECC Visionary Award.[52] As a testament to Certicom's status as the unrivaled leader and authority in ECC research and development, industry members recognized Certicom as "the most commercial promoter of elliptic curve crypto."[53] Indeed, Certicom has been described as the "authority," "leader," and "expert" in the field of ECC.[54]

21. Resulting from its pioneering discoveries in ECC, Certicom is well known to have been the holder of many valuable patents covering certain implementations of ECC. For example, Bruce Schneier[55], an internationally renowned security technologist (known as the "security guru") and Adjunct Lecturer in Public Policy at the Harvard Kennedy School, once said that "Certicom certainly can claim ownership of ECC," noting that "[t]he algorithm was developed and

---

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] https://www.cnet.com/tech/tech-industry/certicom-creates-standards-body/.

[54] *See e.g.*https://www.metzdowd.com/pipermail/cryptography/2004-April/006798.html; https://news.profoundimpact.com/tag/dr-scott-vanstone/; https://cpl.thalesgroup.com/partners/rim-certicom.

[55] *See* https://web.archive.org/web/20250513035631/https://www.hks.harvard.edu/faculty/bruce-schneier; https://www.belfercenter.org/person/bruce-schneier.

patented by the company's founders, and the patents are well written and strong."[56] Certicom claimed to have had "the world's largest intellectual property portfolio for these types of [ECC] patents."[57] After acquiring Certicom, BlackBerry grew that portfolio to over 500 ECC patents.[58]

22. Satoshi chose Certicom's secp256k1 curve for Bitcoin's digital signature algorithm.[59] According to the Bitcoin wiki site, "secp256k1 was almost never used before Bitcoin became popular."[60] As one commentator said, "If it wasn't for Satoshi Nakamoto, you probably would never have heard of the secp256k1 Elliptic Curve Cryptography (ECC) method."[61] Even Dan Brown was surprised to learn that Bitcoin uses secp256k1 instead of other, more commonly used parameters.[62] Some suggest that Satoshi, having not received a recommendation for a specific curve, just "picked one."[63] Others suggest that Satoshi relied on expert cryptographers in selecting secp256k1.[64]

---

[56] https://betanews.com/2007/05/30/certicom-patent-suit-against-sony-threatens-to-unravel-aacs/.

[57] https://www.certicom.com/content/certicom/en/about/news/release/2007/certicom-announces-executive-changes.html.

[58] https://blackberry.certicom.com/en.

[59] *See e.g.*https://medium.com/asecuritysite-when-bob-met-alice/the-bluffers-guide-to-secp256k1-when-satoshi-said-goodbye-to-pki-bad327c4f079; https://news.ycombinator.com/item?id=28813291.

[60] https://en.bitcoin.it/wiki/Secp256k1.

[61] https://medium.com/asecuritysite-when-bob-met-alice/the-bluffers-guide-to-secp256k1-when-satoshi-said-goodbye-to-pki-bad327c4f079.

[62] https://bitcoinmagazine.com/technical/satoshis-genius-unexpected-ways-in-which-bitcoin-dodged-some-cryptographic-bullet-1382996984 (quoting Brown as saying "I did not know that BitCoin is using secp256k1. Indeed, I am surprised to see anybody use secp256k1 instead of secp256r1.").

[63] https://learnmeabitcoin.com/technical/cryptography/elliptic-curve/ (quoting email between Satoshi and Mike Hearn, a "Bitcoin developer" who published his emails with Satoshi).

[64] https://cointelegraph.com/news/satoshi-nakamoto-had-outside-cryptography-help-says-early-bitcoin-dev (citing Laszlo Hanyecz's account of his conversations with Satoshi).

23. Whatever the reason, Satoshi's choice of secp256k1 has proven to be well-liked by the Bitcoin community and the broader cryptocurrency community. The Bitcoin wiki site reports that after Bitcoin's adoption of secp256k1, the curve "is now gaining in popularity due to its several nice properties."[65] Gregory Maxwell, a former Bitcoin developer, said in a public forum in October 2021 that Satoshi's choice of secp256k1 "was a good choice at the time, esp[ecially] now after the expiration of the GLV patent."[66] "The GLV patent" refers to another groundbreaking innovation by Certicom's in-house experts in elliptic curve cryptography, famously known as "GLV Endomorphism,"[67] which the Bitcoin community had been stalking for a decade or more after Hal Finney, foundational Bitcoin developer (and receiver of the first ever Bitcoin transaction), discovered in early 2011 that it can be used to speed up signature verifications by 25%.[68]

24. Finney, a well-known and highly respected cryptographer, posted on February 8, 2011 that he figured out a way to speed up ECDSA signature verification for the secp256k1 curve used by Bitcoin, based on techniques described in "Guide to Elliptic Curve Cryptography" by Hankerson, Menezes and Vanstone.[69] The "Vanstone" of the book's authoring trio is Scott Vanstone, co-founder of Certicom and co-inventor of several of the Asserted Patents in this case. The technique that Finney's post referred to is famously known among the Bitcoin community and elsewhere as "GLV Endomorphism" or the "GLV method," where "GLV" refers to the trio of Certicom innovators that came up with it: Robert Gallant, Robert Lambert, and Scott Vanstone.[70]

---

[65] https://en.bitcoin.it/wiki/Secp256k1.

[66] https://news.ycombinator.com/item?id=28813291.

[67] The Asserted Patents' inventions are independent from and not described in the GLV patent.

[68] https://btctimes.com/hal-finneys-proposal-for-optimizing-bitcoin-to-be-enabled-in-bitcoin-core/.

[69] *Id.*; *see also* https://web.archive.org/web/20241203093903/https:/cointelegraph.com/news/one-of-hal-finney-s-lost-contributions-to-bitcoin-core-to-be-resurrected.

[70] *See id.*

All three were Certicom technologists and are co-inventors of several of the Asserted Patents in this case. It is widely reported that Finney's proposed inclusion of GLV Endomorphism in the Bitcoin protocol, though it was eventually included in the Bitcoin Core software library named libscep256k1, was not officially implemented at the time because of concerns that it would infringe "the GLV patent," *i.e.*, U.S. Patent No. 7,110,538, which names Gallant, Lambert, and Vanstone as the inventors.[71] On the day the GLV patent expired, and over the days that followed, the Bitcoin community celebrated the anticipated inclusion of GLV Endomorphism in future Bitcoin Core releases.[72] In fact, on the day the GLV patent expired, the Bitcoin Core community began the process of deleting the "slower non-endomorphism code" and replacing it with the faster "GLV optimization," including by deleting the code that previously made GLV endomorphism optional, thereby enabling GLV Endomorphism by default.[73] Others in the Bitcoin community later confirmed Finney's observations that GLV Endomorphism results in significantly faster signature verifications (reportedly by 28%).[74] Following Bitcoin's lead, others in the crypto community followed suit in adopting GLV Endomorphism optimizations.[75]

25. While some people like Finney, Malmi, and Hearn are known as early Bitcoin developers, Satoshi Nakamoto is credited with creating the first Bitcoin client, *i.e.*, the first software implementing the Bitcoin protocol.[76] Satoshi announced the release of the first version

---

[71] *See id.*

[72] *See id.*

[73] https://github.com/bitcoin-core/secp256k1/pull/826 ("As the patent on the GLV optimization has expired, there is no need to keep the slower non-endomorphism code around anymore.").

[74] https://btctimes.com/bitcoin-upgrade-glv-enomorphism-tests-show-faster-verification/.

[75] *See* https://github.com/RustCrypto/elliptic-curves/issues/211 ("bitcoin-core/secp256k1 is now switching to the endomorphism implementation by default: bitcoin-core/secp256k1#826 I think it would make sense for us to do the same.").

[76] https://en.bitcoin.it/wiki/Satoshi_Nakamoto.

of Bitcoin software to the "cryptography" community on January 8, 2009.[77] Satoshi's original Bitcoin software is the foundation of today's *de facto* authoritative reference implementation of the Bitcoin protocol, known as "Bitcoin Core."[78] Bitcoin Core continues to implement ECC digital signatures using ECDSA with secp256k1.[79]

26. The public history of Bitcoin's development discussed above shows the impact that Certicom's innovations had on the shaping of Bitcoin and is a testament to the bona fides of Certicom's innovators as significant contributors to the advancement of important and valuable ECC technology.

27. Bitcoin is only one of several cryptocurrencies based on ECDSA and the secp256k1 curve.[80]

***BlackBerry Acquired Certicom Following Years-Long Alliance***

28. BlackBerry was an early adopter of Certicom's ECC technology. In July 2000, in recognition of "Certicom's high performance, efficient ECC," BlackBerry and Certicom entered into "an alliance which will enable RIM to utilize Certicom's elliptic curve cryptography (ECC) technology throughout its wireless product offerings."[81] BlackBerry recognized that "Certicom's Elliptic Curve Cryptography (ECC) technology enables strong, high performance security for many pieces of the computing infrastructure," and that "Certicom's patented implementation of

---

[77] https://satoshi.nakamotoinstitute.org/emails/cryptography/16/.

[78] https://en.bitcoin.it/wiki/Bitcoin_Core (Bitcoin Core is "based on the original reference code by Satoshi Nakamoto"); https://bitcoincore.org/en/about/ ("[Bitcoin Core] is a direct descendant of the original Bitcoin software client released by Satoshi Nakamoto after he published the famous Bitcoin whitepaper.").

[79] https://en.bitcoin.it/wiki/Elliptic_Curve_Digital_Signature_Algorithm; https://en.bitcoin.it/wiki/Secp256k1.

[80] https://ethanfast.com/top-crypto.html

[81] https://www.certicom.com/content/certicom/en/about/news/release/2000/research-in-motion-and-certicom-to-enable-trusted-mobile-commerc.html.

ECC technology provides a more efficient alternative to conventional public key cryptographic algorithms … allowing for faster processing speed, reduced bandwidth usage and decreased battery requirements."[82] Accordingly, BlackBerry entered into an "agreement with Certicom, a leader in ECC wireless security technology, [to] enable [BlackBerry] to provide the market with the secure mobile devices they require for m-commerce transactions."[83]

29. In 2009, BlackBerry acquired Certicom, giving rise to BlackBerry Certicom, "a leader in applied cryptography and key management."[84] Certicom's industry-leading research and development continued under BlackBerry Certicom; together BlackBerry and Certicom continued innovating and improving ECC technology. As a result of its rich history in ECC technology development, "BlackBerry Certicom has industry leading expertise in Elliptic Curve Cryptography and has established the world's largest ECC-based patent portfolio."[85] Plaintiff Malikie now owns part of that portfolio, including the Asserted Patents.

***Cryptocurrency Basics***

30. Bitcoin paved the way for the thousands of cryptocurrencies that exist today. The term "cryptocurrency," or "crypto" for short, refers to a category of "digital money" that, like the fundamental purpose of Bitcoin, "makes it possible to transfer value online without the need for a middleman like a bank or payment processor."[86] Most cryptocurrencies, including Bitcoin, are decentralized (not managed or controlled by a government or other central authority), not backed by anything of independent value (such as gold), and not guaranteed by anyone (such as a

---

[82] *Id.*

[83] *Id.*

[84] https://www.certicom.com/content/certicom/en/about.html.

[85] *Id.*; *see* https://blackberry.certicom.com/en.

[86] https://www.coinbase.com/learn/crypto-basics/what-is-cryptocurrency.

government or bank). Instead, cryptocurrencies are managed by "peer-to-peer networks of computers running free, open-source software."[87] Specifically, cryptocurrency transactions are vetted and recorded using a technology called "blockchain," which is a decentralized database system that stores data in a distributed network of computers. This is in some ways analogous to the ledger of accounts and transactions maintained by a traditional financial intermediary (such as a bank or credit card company). However, unlike with a traditional intermediary where the security of transactions and accounts is vested solely in the intermediary (which requires its customers to trust the intermediary with their money), the security of blockchain transactions is effected by the use of cryptography and "consensus" mechanisms to ensure that a majority of the computers on the network agree that a transaction is valid before it is recorded (*i.e.*, deemed to have occurred).[88]

31. As the name suggests, cryptocurrencies fundamentally rely on concepts from cryptography and computer science to enable the creation of such decentralized, internet-based monetary systems that are secure. Indeed, as stated on the Ethereum website, the world's second most popular cryptocurrency, "[t]he reason assets such as bitcoin and ether are called 'cryptocurrencies' is that the security of your data and assets is guaranteed by cryptography, not by trusting an institution or corporation to act honestly."[89] Cryptocurrencies rely on cryptography (hence the name *crypto*currency) to protect participants' assets from theft and to protect the cryptocurrency system from dishonest or unauthorized manipulation that results in dilution of the currency (*e.g.*, double spending).[90] More fundamentally, cryptography is what enables

---

[87] *Id.*

[88] *Id.*

[89] https://web.archive.org/web/20241216232605/https://ethereum.org/en/what-is-ethereum/ (answering "What is a cryptocurrency?"); *see also* https://www.coinbase.com/learn/crypto-basics/what-is-cryptography ("Cryptocurrencies are entirely based on cryptographic ideas.").

[90] *See* https://www.coinbase.com/learn/crypto-basics/what-is-cryptography.

cryptocurrencies like Bitcoin to be "trustless," *i.e.*, what allows cryptocurrency to be transacted securely (even between strangers) without the need for a trusted intermediary to verify and process payments.[91]

***Transactions***

32. The role of cryptography as a fundamentally enabling technology in cryptocurrencies like Bitcoin is evident in how cryptocurrency transactions are processed, *i.e.*, initiated, validated, and recorded in the blockchain. Unlike with typical currencies, where transactions transfer an amount of currency from one account to another that is redeemable in physical notes and coins, "cryptocurrency transactions are simply data entries recorded on an unchangeable, distributed ledger, referred to as a blockchain."[92] That is, with cryptocurrencies, "no cryptocurrency is actually exchanged between people. Instead, ownership data associated with both parties' crypto wallets is updated on the blockchain each time a transaction is processed."[93]

33. A cryptocurrency transaction—transferring crypto from the sender's digital wallet to the receiver's digital wallet—involves several steps. Using wallet software, a transaction (essentially, a bundle of data) is created that identifies the sender's address (using a public key), the recipient's address (also using a public key), and the amount of cryptocurrency to be sent.[94] The transaction requestor then creates a digital signature for the transaction with its private key and public key (which are cryptographically linked, as the private key is used to create the public key) and submits the signed transaction to the blockchain network for validation. By signing the transaction with its private key, the requestor proves to the receiving party and to the blockchain

---

[91] *See id.*

[92] https://www.kraken.com/learn/how-do-cryptocurrency-transactions-work.

[93] *Id.*

[94] *Id.*

network that the transaction is valid. After the receiving party validates the transaction using the sender's public key, the transaction is broadcast to and propagated through the blockchain network, where a majority of network nodes must independently verify that the transaction is valid in order for the transaction to be added to the next "block" of the blockchain and thus be permanently and irreversibly recorded.[95]

***Wallets***

34. A cryptocurrency "wallet" is a tool for interacting with a Blockchain network that allows a user to send and receive cryptocurrencies like Bitcoin.[96] A wallet is typically an application (software) that functions as a wallet for storing the user's private keys and provides interfaces to access and perform transactions with the user's cryptocurrency. Wallets can be custodial (keys are managed by a third party) or non-custodial (keys are managed solely by the user). Forms of hardware wallets also exist (*e.g.*, a USB drive wallet). Crypto wallets don't store the actual cryptocurrency (because the cryptocurrency exists as data in the blockchain) but instead store the public and private keys needed to carry out crypto transactions on the blockchain.[97]

***Private Keys and Public Keys***

35. Private keys and public keys are related but different pieces of information used in cryptocurrency transactions. They are part of a technique known as asymmetric cryptography, in which two keys are used: (1) a private key (possessed by only the entity wishing to prove its identity) and (2) a public key (possessed by any number of entities who wishes to verify the identity of the entity possessing the private key).[98] Unlike the alternative approach known as symmetric

---

[95] *See id.*

[96] https://www.investopedia.com/terms/b/bitcoin-wallet.asp.

[97] *See id.*

[98] https://www.certicom.com/content/dam/certicom/images/pdfs/WP-ECCprimer.pdf ("ECC Primer") at 4.

cryptography—in which a single key is used by both (or all) parties for their respective purposes, thereby preventing the key from being associated with a unique identity—asymmetric cryptography simplifies key exchange by reducing the number of keys needed to secure messages between parties and allows a message signature to be uniquely authenticated (*i.e.*, associated with the unique identity of the sender).[99]



**SYMMETRIC**
Symmetric cryptography has an equation of $\frac{n(n-1)}{2}$ for the number of keys needed. In a situation with 1000 users, that would mean **499,500 keys**.

**ASYMMETRIC**
Asymmetric cryptography, using key pairs for each of its users, has *n* as the number of key pairs needed. In a situation with 1000 users, that would mean **1000 key pairs**.

ECC Primer at 5

36. Importantly, while the public key can be used by an entity to verify that another possesses the corresponding private key, "you cannot derive the private key from the public. This is the critical feature of asymmetric cryptographic schemes that makes them so useful." ECC Primer at 4; *see also id.* ("The critical feature of asymmetric cryptography, that makes it useful, is this key pair—and more specifically, a particular feature of the key pair: the fact that one of the keys cannot be obtained from the other."). It is also "the core technology behind digital

[99] *Id*. at 4–5.

signatures." *Id*. "A digital signature is a transform performed on a message using the private key, whose integrity may be verified with the public key." *Id*. at 5.




ECC Primer at 5

ECC is an approach to doing asymmetric cryptography, including for use with digital signatures. *Id*.

37. Private and public keys form a related key-pair—a public key is generated from a private key through a one-way hash function (or "trapdoor function") that is relatively easy to solve in one direction but nearly impossible to solve in the other direction, making it nearly impossible to determine a private key from a public key.[100] *See also* ECC Primer at 6-7 ("In all asymmetric cryptographic schemes, this property—the property that one key is used for encryption, and another for decryption, and the decryption key cannot be found from the encryption key—is derived from the use of mathematical functions whose inverse is extremely difficult to calculate. You may understand an asymmetric cryptographic key pair as a pair of numbers which have some relationship associated with a mathematical function which is relatively easy to compute in one direction, but whose inverse is in practical terms intractable. This feature—the function which is tractable in one direction, but intractable in the other, is common to all asymmetric cryptosystems, including ECC."). This characteristic of asymmetric cryptography allows the sender of cryptocurrency to digitally sign a transaction using their unique and secret private key as proof of ownership, and it allows the recipient and blockchain nodes to verify the

[100] https://www.ledger.com/academy/blockchain/what-are-public-keys-and-private-keys.

digital signature and validate the transaction using the sender's public key. Accordingly, in cryptocurrency transactions, public keys are used to identify the sending and receiving addresses (akin to account numbers in a bank), and private keys are used to sign transactions when sending cryptocurrency to others (which can be verified by the receiver and the blockchain network using the sender's public key).[101]

### ***Blockchain***

38. Cryptocurrencies like Bitcoin are based on a technology called "blockchain."[102] A blockchain is essentially a distributed database that, in a cryptocurrency network like Bitcoin, contains a list or "ledger" of all historical transactions on the network (*i.e.*, a record of every time anyone sent or received bitcoin). The blockchain of a cryptocurrency like Bitcoin is in some ways akin to the ledger or balance sheet of a bank.

39. A blockchain network includes a number of distributed computers (called "nodes") that store a copy of the blockchain ledger and participate in the verification and recording of each transaction.[103] To become part of the blockchain ledger, a transaction must be transmitted to the network of nodes, which work to confirm the validity of the transaction using cryptographic algorithms. Valid transactions are collected into a fixed-size data file called a "block" (akin to a page of a ledger) that, once filled, is run through a cryptographic hash function (that is, the block is "hashed") to generate a unique hash value for that block. That block's hash value is included within the next block that is created so that when the next block is hashed, its hash value depends

---

[101] *See id.*

[102] *See* https://www.investopedia.com/terms/b/blockchain.asp.

[103] *See id.*

on the hash of the previous block, thereby creating an irreversible "chain" of blocks (hence the name "blockchain") as the process continues.[104] *See also* Bitcoin Whitepaper at 2–5.




Bitcoin Whitepaper at 3




Bitcoin Whitepaper at 5

40. The Bitcoin blockchain creates a chronological ledger of chained transactions where each new block depends on the information from all previous blocks, thereby making it nearly impossible to undo or manipulate historical transactions without permission.[105] *See also* Bitcoin Whitepaper at 2–3 ("Once the CPU effort has been expended to make it satisfy the proof-of-work, the block cannot be changed without redoing the work. As later blocks are chained after it, the work to change the block would include redoing all the blocks after it."), *id.* ("To modify a

---

[104] *See id.*

[105] *See id.*

past block, an attacker would have to redo the proof-of-work of the block and all blocks after it and then catch up with and surpass the work of the honest nodes. We will show later that the probability of a slower attacker catching up diminishes exponentially as subsequent blocks are added.”).

**Crypto.com Operates One of the World’s Largest Cryptocurrency Exchange and Wallet Platforms**

41. Crypto.com holds itself out as an industry leader. Founded in 2016, Crypto.com announced in May 2024 that it “has surpassed the 100 million global user mark,”[106] and its current mobile application listings advertise that Crypto.com is “[t]rusted by 150M+ users globally.”[107] Crypto.com’s website touts that its platform is used by 150 million users in 90 countries.[108] Crypto.com’s stated vision is “Cryptocurrency in Every Wallet™.”

42. Crypto.com operates an integrated suite of cryptocurrency products. The Crypto.com App permits users to buy, sell, send, receive, and store hundreds of cryptocurrencies; the Crypto.com Exchange is a trading venue on which, according to Crypto.com, customers “can trade over 300 cryptocurrencies and 480 trading pairs” and which Crypto.com describes as “the world’s number one USD-supporting cryptocurrency exchange”;[109] Crypto.com Onchain—“the rebranded version of DeFi Wallet”—is a “non-custodial multi-chain wallet” through which users “manage [their] tokens across multiple chains, including Ethereum, Bitcoin, Solana, and

[106] Crypto.com, Crypto.com Surpasses 100 Million Global Users (May 6, 2024), https://crypto.com/en/company-news/cryptocom-surpasses-100-million-global-users.

[107] *See* https://apps.apple.com/us/app/crypto-com-trade-every-market/id1262148500; https://play.google.com/store/apps/details?id=co.mona.android.

[108] https://crypto.com/us/about

[109] Crypto.com, Crypto.com Exchange Set for U.S. Launch (Jan. 21, 2025), https://crypto.com/en/company-news/crypto-com-exchange-set-for-u-s-launch.

Cronos";[110] and Crypto.com operates the Cronos blockchain networks, including Cronos POS Chain, Cronos EVM, and the Cronos zkEVM Bridge, together with the validator node and staking infrastructure that support them.[111]

43. Crypto.com is the custodian of its customers' digital assets and controls the cryptographic keys used to move them. Crypto.com states that it "hold[s] all customer assets deposited on [its] platform in institutional-grade reserve accounts on a 1:1 basis" and that it maintains "strict controls on access rights to funds in both cold and hot wallets."[112] Crypto.com further states that, unlike its non-custodial Onchain wallet, "the Crypto.com App stores your cryptocurrencies for you," and that on the Crypto.com App the user "do[es] not control the private keys."[113] On information and belief, Crypto.com's custody infrastructure includes hot, warm, and cold wallets and hardware security modules (HSMs) that hold private cryptographic keys and generate digital signatures on Crypto.com's behalf.

**Crypto.com's United States Operations and Infrastructure**

44. Crypto.com's United States business is substantial and is run from this District. Crypto.com states that "[t]he Crypto.com App is currently available in 49 states in the United

[110] Crypto.com, Crypto.com Onchain, https://crypto.com/en/onchain.

[111] *See* Business Combination Agreement, Ex. 2.1 (Aug. 25, 2025) (describing the contribution of "6,313,000,212 Cronos tokens and all necessary physical devices required to establish and operate a Cronos proof of stake validator node and staking infrastructure"), https://www.sec.gov/Archives/edgar/data/2064658/000110465925083153/tm2524365d3_ex2-1.htm; see also https://docs.cronos.com/getting-started/architecture; https://cronos-pos.org/; https://zkevm.cronos.org/bridge/.

[112] Crypto.com, Security, https://crypto.com/eea/security.

[113] Crypto.com, Crypto.com Onchain, https://crypto.com/en/onchain.

States of America & US Territories, including . . . Texas."[114] Crypto.com holds a suite of United States regulatory authorizations, including "Broker-Dealer Registration; Derivatives Clearing Organization (DCO) License; Designated Contracts Market (DCM) License; Money Services Business Registration; Money Transmitter Licenses; National Trust Bank Charter (conditional approval); [and] Non-depository Trust Company Charter."[115] In January 2025, Crypto.com announced that "[t]he Crypto.com Exchange [is] Set for U.S. Launch," such that "U.S. institutional and advanced traders can now access the world's leading USD-supporting cryptocurrency exchange, featuring deep liquidity and ultra-low latency."[116] Crypto.com maintains its North America headquarters in Tyler, Texas, and advertises open positions based in Tyler, Texas.[117]

45. Crypto.com operates its platform on cloud server infrastructure supplied by cloud service providers, including servers physically located in various regions in the United States selected by Crypto.com.

46. On information and belief, the server infrastructure Crypto.com uses to serve its United States customers—including the customers it serves in Texas and in this District—is located in the United States. Two independent forces drive that result: the economics of latency, and the requirements of United States regulators.

47. First, latency. The value of an electronic trading venue is a direct function of how quickly it can receive, match, and acknowledge orders, and the single largest controllable

---

[114] Crypto.com Help Center, In which U.S. states is the Crypto.com App available? (Sept. 15, 2025), https://help.crypto.com/en/articles/2692288-in-which-u-s-states-the-crypto-com-app-is-available.

[115] Crypto.com, Licenses and Registrations, https://crypto.com/en/licenses.

[116] Crypto.com, Crypto.com Exchange Set for U.S. Launch (Jan. 21, 2025), https://crypto.com/en/company-news/crypto-com-exchange-set-for-u-s-launch.

[117] *See* https://jobs.lever.co/crypto?location=Tyler%2C%20Texas (listing openings located in "Tyler, Texas").

component of that delay is the physical distance a signal must travel between the customer and the server.[118] For example, "one key aspect to improving network performance between two points on a network is to decrease the physical distance between them," where "these points are the Crypto exchange matching engine and a Crypto market-making trading engine," and that the resulting latency "impacts the profitability of market-makers" such that "exchanges with better latency profiles attract more and better-quality liquidity, in turn attracting customers and higher trading volumes."[119]

48. Crypto.com competes on precisely that margin, and says so. Crypto.com advertises that its "cutting-edge matching engine can scale to support up to 64 million transactions per second with ultra-low 370-nanosecond matching latency," that its FIX 4.4, WebSocket, and REST application programming interfaces "provid[e] an ultra-low latency trading experience," and that its Exchange is "ideal for high-frequency trading."[120] A matching engine measured in hundreds of nanoseconds is meaningful only if the network path to it is correspondingly short; a customer in Texas routed to a server on another continent would incur round-trip network delay hundreds of thousands of times larger than the 370 nanoseconds Crypto.com advertises, swamping the engine's performance entirely. Crypto.com made that claim in the same announcement in which it told

---

[118] AWS, Considerations for choosing an AWS Region, https://docs.aws.amazon.com/singlesignon/latest/userguide/identity-center-region-considerations.html.

[119] AWS for Industries, Crypto market-making latency and Amazon EC2 shared placement groups (Jan. 24, 2023), https://aws.amazon.com/blogs/industries/crypto-market-making-latency-and-amazon-ec2-shared-placement-groups/.

[120] Crypto.com, Crypto.com Exchange Set for U.S. Launch (Jan. 21, 2025), https://crypto.com/en/company-news/crypto-com-exchange-set-for-u-s-launch.

"U.S. institutional and advanced traders" that they "can now access" its Exchange with "deep liquidity and ultra-low latency."[121]

49. Crypto.com's own conduct confirms that it sites its servers next to the traders it serves. Crypto.com states that its FIX application programming interface "offers DMA [direct market access] to the GEN 3.0 Crypto.com Exchange via co-location in AWS Tokyo, which boosts the connectivity performance by 70%."[122] That is a deliberate, disclosed decision to place Crypto.com's servers in regions nearest to the traders that connect to them, and it reflects a general practice, not a one-off: Crypto.com's Exchange FIX API alone "is available across 3 servers."[123]

50. On information and belief, Crypto.com applies that same practice to the United States market it launched in January 2025 and to the 49 states in which its App operates, and accordingly deploys and operates server infrastructure in the United States to serve its United States customers.

51. Second, regulation. Digital sovereignty regulations or company policies may mandate the use of a particular geographic regions, and customers are encouraged to "[c]onsult with your company's legal department" on the point.[124] Crypto.com is a United States registered broker-dealer, a CFTC-registered designated contract market and derivatives clearing organization, a registered money services business, and a state-licensed money transmitter, and it has been the subject of a Texas Department of Banking consent order for conducting money

---

[121] *Id.*

[122] Crypto.com, Introducing FIX API for the GEN 3.0 Crypto.com Exchange (Mar. 4, 2026), https://crypto.com/en/product-news/fixapi.

[123] Crypto.com Exchange Developer Documentation, FIX Protocol, https://exchange-developer.crypto.com/exchange/v1/docs/api/fix/exchange-fix-protocol.

[124] https://docs.aws.amazon.com/singlesignon/latest/userguide/identity-center-region-considerations.html.

transmission in Texas.[125] On information and belief, those authorizations and the recordkeeping, books-and-records, surveillance, and examination obligations that accompany them further require Crypto.com to maintain, in the United States, the servers on which its United States customers' transactions are executed and recorded.

52. Finally, and independently, a substantial portion of the accused activity occurs on hardware that is indisputably located in the United States and in this District: the phones, tablets, and computers of Crypto.com's United States users. Crypto.com distributes the Crypto.com App, the Crypto.com Exchange app, the Crypto.com Onchain app, and the Crypto.com Pay for Business app to users in 49 states, including Texas, and those applications execute the accused cryptographic operations—key validity checking, digital signature generation, modular reduction, and secured-link establishment—on the users' own devices.

**<u>Defendants' Use of the Patented Technologies</u>**

53. Crypto.com engages and has engaged in the operation of a cryptocurrency exchange, a custodial and non-custodial digital wallet business, a payments business, and blockchain networks, through certain instrumentalities identified below. These instrumentalities ("Accused Instrumentalities") include the Crypto.com App (iOS and Android), the Crypto.com Exchange and Crypto.com Exchange app (iOS and Android), the Crypto.com Onchain (formerly DeFi Wallet) app (iOS and Android), the Crypto.com Pay for Business app (iOS and Android), Crypto.com's servers, Crypto.com's stablecoin settlement systems, and the Crypto.com Cronos POS Chain, Cronos EVM, and Cronos zkEVM Bridge, together with the devices and software Crypto.com uses to sign, send, transfer, transmit, spend, or verify cryptocurrency and stablecoin

---

[125] Tex. Dep't of Banking, Press Release (May 7, 2025), https://www.dob.texas.gov/sites/default/files/files/news/press-releases/2025/05-07-25bpr.pdf.

transactions—including computers, nodes, servers, applications, programs, and wallets and their associated processors (e.g., a digital wallet, a hot wallet, a cold wallet, a warm wallet, a hardware wallet, a hardware security module (HSM), or an embedded device). On information and belief, Crypto.com's Exchange had an approximate balance of $3.2B in BTC as of September 20, 2026, and approximately $11B in BTC had been deposited on the Crypto.com's Exchange, year to date.

54. On information and belief, Crypto.com is responsible for the generation of digital signatures, including digital signatures consistent with the Bitcoin protocol using ECDSA and the secp256k1 elliptic curve, and corresponding signatures on the other blockchain networks it supports. For example, Crypto.com maintains custody of its customers' digital assets and processes their withdrawals, transfers, trades, settlements, and payments; under the Bitcoin protocol and the protocols of the other blockchains Crypto.com supports, moving those assets on chain requires generating a digital signature over the transaction using a private cryptographic key, which under the Bitcoin protocol requires generating an ECDSA signature over the secp256k1 curve. On information and belief, Crypto.com generates those signatures using the hot, warm, and cold wallets and hardware security modules in which it holds the corresponding private keys.

55. On information and belief, Crypto.com is likewise responsible for the verification of digital signatures, including digital signatures consistent with the Ethereum protocol using ECDSA and the secp256k1 elliptic curve. For example, Crypto.com operates blockchain nodes—including the validator nodes and staking infrastructure of the Cronos networks and the nodes it operates to credit customer deposits, confirm withdrawals, and settle stablecoin transactions—and validating the transactions those nodes process requires verifying the signatures that authorize them. For example, Truth Social Bitcoin and Ethereum ETF, B.T. (the "Trust") has engaged Foris DAX, Inc. as its exclusive Staking infrastructure provider (the "Staking Provider") in connection

with any Staking activities the Trust may conduct[126]. The Staking Provider would provide hardware, software and services necessary to enable the Trust to establish validator nodes and stake the Trust's ether on the Ethereum Network[127]. On information and belief, such verification includes recovering the signer's public key from the components of the signature and using the recovered public key to verify the signature, as reflected in the public-key-recovery functionality of the secp256k1 library used in the Ethereum system.

56. On information and belief, Crypto.com performs the foregoing signature generation and verification operations on servers located in the United States, for the reasons set forth above: Crypto.com serves customers in 49 states, launched its Exchange to United States institutional and advanced traders in January 2025 on the strength of "ultra-low latency," advertises a matching engine operating at "370-nanosecond matching latency," and has publicly confirmed that it co-locates its Exchange infrastructure in a region nearest the traders it serves. On information and belief, Crypto.com applies that same latency-driven siting practice, and complies with the same United States regulatory requirements, with respect to the servers that serve its United States customers.

57. On information and belief, Crypto.com uses digital asset wallets for receiving, holding, and transferring cryptocurrency. Crypto.com states that "the Crypto.com App stores your cryptocurrencies for you" and that it maintains "strict controls on access rights to funds in both cold and hot wallets," and it separately offers Crypto.com Onchain, a "non-custodial multi-chain

---

[126] https://www.federalregister.gov/documents/2025/07/10/2025-12809/self-regulatory-organizations-nyse-arca-inc-notice-of-filing-of-proposed-rule-change-to-list-and

[127] *Id*.

wallet" in which "[y]our private keys are encrypted locally on your device with Secure Enclave."[128]

58. On information and belief, Crypto.com performs the foregoing cryptographic operations using modular arithmetic, including Montgomery-style modular reduction, in the course of generating and verifying the elliptic curve digital signatures that authorize its customers' transactions.

59. On information and belief, Crypto.com secures the communication links between its servers and the devices with which they communicate—including the phones, computers, and servers of its users, its institutional customers, and its market makers—using cryptographic keys that its servers generate through a handshake with the other device. Crypto.com's public endpoints, including its website, its application programming interfaces, and its Exchange application programming interfaces, are served over Transport Layer Security, including TLS 1.3. TLS is a protocol that "provides privacy and data integrity between two communicating applications."[129] On information and belief, and as specified by the TLS protocol, securing such a link includes generating a first cryptographic key (e.g., an ephemeral public key carried in the key_share extension); generating a second cryptographic key (e.g., the asymmetric shared secret derived from the parties' ephemeral keys); hashing the handshake messages exchanged between the two devices over the link to create a hash result (e.g., the Transcript-Hash); and hashing that first key, that second key, and that hash result to generate the further cryptographic keys (including the client_write_key and server_write_key) used to secure the link.

[128] Crypto.com, Crypto.com Onchain, https://crypto.com/en/onchain; Crypto.com, Security, https://crypto.com/eea/security.

[129] *See* T. Dierks & E. Rescorla, The Transport Layer Security (TLS) Protocol Version 1.2, RFC 5246, at 3 (Aug. 2008); see also E. Rescorla, The Transport Layer Security (TLS) Protocol Version 1.3, RFC 8446 (Aug. 2018).

60. On information and belief, the servers that establish and terminate those secured links include servers Crypto.com operates in the United States, including the servers serving the United States customers of the Crypto.com App and the Crypto.com Exchange.

61. Crypto.com began engaging in the foregoing infringing activities years after Certicom and BlackBerry invented and received patents covering the technologies at issue in this action. Indeed, these innovations were already incorporated into the Bitcoin protocol and architecture by the time Crypto.com was founded in 2016, and Crypto.com has continued the foregoing activities to the present.

62. On July 25, 2025, Malikie sent a letter to Foris DAX Asia Pte Ltd. (d/b/a Crypto.com)'s Chief Legal Officer, providing notice of the Asserted Patents and of Crypto.com's infringement of Malikie's patents, including the '197 Patent and the '286 Patent, and exemplary instrumentalities that practice them. The letter also included an invitation to engage in licensing discussions, including for the Asserted Patents.

63. No one from or on behalf of Crypto.com responded to Malikie's letter.

64. Because Crypto.com has been unwilling to take a license (or even engage in licensing discussions), Malikie has been left with no choice but to bring this action to enforce its rights as the owner of valid and valuable patents that Defendants have infringed, and, in the case of the '197 Patent, the '286 Patent, and '323 Patent, continue to infringe.

## PATENTS IN SUIT

65. Malikie is the assignee of and owns all rights and title to the Asserted Patents.

66. The Asserted Patents, now owned by Malikie, were originally assigned to Certicom or to Research In Motion Limited, now known as BlackBerry Limited. Their inventors are former Certicom and BlackBerry employees who spearheaded Certicom's industry-leading research and

development in elliptic curve cryptography, applied cryptography and key management, and other data security technologies. After a longstanding alliance between BlackBerry and Certicom that enabled BlackBerry to utilize Certicom's elliptic curve cryptography technology in its products, BlackBerry acquired Certicom in 2009.[130] Through its acquisition of Certicom and continued research and development in ECC, key management, and other aspects of data security, BlackBerry amassed "the world's largest ECC-based patent portfolio,"[131] which grew to include over 500 ECC patents[132].

67. Certicom and BlackBerry developed numerous innovative and diverse technologies, including groundbreaking inventions pertaining to generating and verifying digital signatures and related cryptographic and data security technology. Some of these groundbreaking inventions are described and claimed in certain of the Asserted Patents.

**The "Accelerated Verification" Patent ('197)**

68. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

69. The '197 Patent, entitled "Accelerated Verification of Digital Signatures and Public Keys," was duly and lawfully issued on August 12, 2014. A true and correct copy of the '197 Patent is attached hereto as Exhibit 1. The application for the '197 Patent was filed on May 23, 2012 and claims the benefit of priority to earlier related applications, including provisional application no. 60/644,034, filed on January 18, 2005. The named inventors include Scott A. Vanstone, Daniel R. Brown, Adrian Antipa, and Robert Gallant, who were researchers at Certicom Corporation.

---

[130] *See* https://www.certicom.com/content/certicom/en/about.html; https://www.certicom.com/content/certicom/en/about/news/release/2000/research-in-motion-and-certicom-to-enable-trusted-mobile-commerc.html.

[131] https://www.certicom.com/content/certicom/en/about.html.

[132] https://blackberry.certicom.com/en; https://www.certicom.com/.

70. The ’197 Patent was in full force and effect since its issuance. Malikie owns by assignment the entire right and title in and to the ’197 Patent, including the right to seek damages for any infringement thereof.

71. The ’197 Patent relates to computational techniques used in cryptographic algorithms, including elliptic curve algorithms for generating and verifying digital signatures, that enable accelerated digital signature verification. *See, e.g.*, Ex. 1 at 1:12-13, 4:15-33, 9:32-37, 11:43-50, 12:47-59, 13:60-62, 14:40-42, 15:27-40.

72. Cryptographic algorithms for generating and verifying digital signatures are used in cryptographic systems (or “cryptosystems”) to secure electronic data in computer systems and computer networks. *See*, *e.g.*, Ex. 1 at 1:18-48; *see also*, *e.g.*, 2:17-3:17, 6:23-36. The nature of electronic data in computer systems and computer networks presents unique security concerns relating to, for example, digital message authenticity, for which specialized digital signature techniques were found to be necessary. *See*, *e.g.*, Ex. 1 at 1:18-48; *see also*, *e.g.*, *id*. at 2:17-3:17; Whitfield Diffie and Martin Hellman, *New Directions in Cryptography* (1976)[133] at 645 (“Current electronic authentication techniques cannot meet this need.”), 647 (“Unforgeable digital signatures and receipts are needed.”), 649 (“Current electronic authentication systems cannot meet the need for a purely digital, unforgeable, message dependent signature. They provide protection against third party forgeries, but do not protect against disputes between transmitter and receiver.”), 649 (observing that “we must discover a digital phenomenon” to provide authentication for a “purely electronic form of communication”).

73. Digital signatures are generated using public key cryptography, *see*, *e.g.*, Ex. 1 at 1:18-48; *see also*, *e.g.*, *id*. at 2:17-3:17, which is a type of technology for securing electronic

[133] https://ee.stanford.edu/~hellman/publications/24.pdf (“*New Directions in Cryptography*”).

communications that was discovered after the advent of digital computing to address cryptography problems arising particularly in "computer controlled communication networks" that created "a need for new types of cryptographic systems."[134] *New Directions in Cryptography* at 644; *see also id*. ("Contemporary cryptography is unable to meet the requirements, in that its use would impose such severe inconveniences on the system users, as to eliminate many of the benefits of teleprocessing."); https://www.invent.org/inductees/whitfield-diffie ("In 1976, Whitfield Diffie, Martin Hellman, and Ralph Merkle developed public key cryptography (PKC), an innovative new method for securing electronic communications."); https://web.archive.org/web/20250708132542/https:/archive.nytimes.com/www.nytimes.com/library/cyber/week/122497encrypt.html ("The set of algorithms, equations and arcane mathematics that make up public key cryptography are a crucial technology for preserving computer privacy in and making commerce possible on the Internet. Some hail its discovery as one of the most important accomplishments of 20th-century mathematics …. Without it, there would be no privacy in cyberspace."); Whitfield Diffie, *The First Ten Years of Public Key Cryptography* (1988)[135] at 560 ("Public key cryptography was born in May 1975, the child of two problems," where "[t]he second problem … was the problem of signatures. Could a method be devised that would provide the recipient of a purely digital electronic message with a way of demonstrating to other people that it had come from a particular person…?"); *id*. at 560 ("This separation [of the capacities for encryption and decryption using public key cryptography] allows important improvements in the

[134] Some credit Whitfield Diffie, Martin Hellman, and Ralph Merkle with discovering public key cryptography, while others credit James Ellis, Clifford Cocks, and Malcom Williamson. Diffie, Hellman, and Merkle have received multiple patents for public key cryptography techniques, including U.S. Patent Nos. 4,200,770 and 4,218,582. Other public key cryptography techniques, like RSA, have also been patented. *See e.g.* U.S. Patent No. 4,405,829.

[135] https://www.cs.virginia.edu/~evans/greatworks/diffie.pdf ("*The First Ten Years of Public Key Cryptography*").

management of cryptographic keys and makes it possible to 'sign' a purely digital message."); https://bitcoinwiki.org/wiki/public-key-cryptography ("Public key algorithms are fundamental security ingredients in modern [ ] applications and protocols assuring the confidentiality[ and] authenticity [ ] of electronic communications and data storage. They underpin various Internet standards …."); https://www.nsa.gov/History/Cryptologic-History/Historical-Figures/Historical-Figures-View/Article/3006218/clifford-cocks-james-ellis-and-malcolm-williamson/ ("The security of the global communication infrastructure is built on public key cryptography and the importance of PKC in enabling the modern world of secure banking, e-commerce, and encrypted messaging cannot be overstated.").

74. As the '197 Patent explains, "Public key cryptography permits the secure communication over a data communication system without the necessity to transfer identical keys to other parties in the information exchange through independent mechanisms, such as a courier or the like." *See*, *e.g.*, Ex. 1 at 1:24-34. "Public key cryptography is based upon the generation of a key pair, one of which is private and the other public that are related by a one way mathematical function." *Id*. "The one way function is such that, in the underlying mathematical structure, the public key is readily computed from the private key but the private key cannot feasibly be ascertained from the public key." *Id*. "Public key cryptography may also be used to digitally sign a message to authenticate the origin of the message." *Id*. at 1:44-48. "The author of the message signs the message using his private key and the authenticity of the message may then be verified using the corresponding public key." *Id*. So, in a network where members do not know each other (or wish to remain pseudonymous) and have never even communicated with each other previously, "[a] subscriber can sign a message by encrypting it with his own secret key. Anyone with access to the public key can verify that it must have been encrypted with the corresponding secret key,

but this is of no help to him in creating (forging) a message with this property." *The First Ten Years of Public Key Cryptography* at 561. "The availability of a signature that the receiver of a message cannot forge and the sender cannot readily disavow makes it possible to trust the network with negotiations and transactions of much higher value than would otherwise be possible." *Id.* Accordingly, digital signature technology based on public key cryptography fundamentally enables "trustless" networks that do not require a trusted intermediary to verify or authenticate messages.

75. The '197 Patent further explains that "[t]he security of such systems [employing digital signatures using public key cryptography] is dependent to a large part on the underlying mathematical structure." *See*, *e.g.*, Ex. 1 at 1:49-55. "The most commonly used structure for implementing discrete logarithm systems is a cyclic subgroup of a multiplicative group of a finite field in which the group operation is multiplication or cyclic subgroups of elliptic curve groups in which the group operation is addition." *Id.*

76. "An elliptic curve E is a set of points of the form (x,y) where x and y are in a field F, such as the integers modulo a prime [number] p, commonly referred to as Fp, and x and y satisfy a non-singular cubic equation, which can take the form $y^2=x^3+ax+b$ for some a and b in F." *Id.* at 1:56-2:16. Elliptic curves have other defining characteristics that give them special properties making them useful for cryptographic implementations. *See id.*

77. "In an elliptic curve cryptosystem," "[t]he key pair may be used with various cryptographic algorithms to establish common keys for encryption and to perform digital signatures." *Id.* at 2:17-27. "One such algorithm is the Elliptic Curve Digital Signature Algorithm (ECDSA) used to generate digital signatures on messages exchanged between entities. Entities using ECDSA have two roles, that of a signer and that of a verifier." *Id.* at 2:28-31. In ECDSA

cryptosystems, "[the] signer selects a long term private key d, which ... must be secret." *Id*. at 2:31-41. The signer also computes "Q", which is "the long term public key of the signer, and is made available to the verifiers." *Id*. "Finding the private key d from the public key Q is believed to [be] an intractable problem for the choices of elliptic curves used today." *Id*. Accordingly, "[f]or any message M, the signer can create a signature, which is a pair of integers (r, s) in the case ECDSA," and "[a]ny verifier can take the message M, the public key Q, and the signature (r, s), and verify whether it was created by the corresponding signer." *Id*. at 2:42-48. This is because creation of a valid signature (r, s) is believed to be possible only by an entity who knows the private key d corresponding to the public key Q." *Id*.

78. The process for creating a digital signature (signing an electronic message) using ECDSA includes, among others, the following steps. "First, the signer chooses some integer k … that is to be used as a session, or ephemeral, private key. The value k must be secret." *Id*. at 2:49-63. "Then, the signer computes a point R=kG that has coordinates (x, y)." *Id*. "Next, the signer converts x to an integer x' and then computes r=x' mod n, which is the first coordinate of the signature." *Id*. "The signer must also compute the integer e=h(M) mod n, where h is [a] hash function." *Id*. "Finally, the second coordinate s is computed as s=(e+dr)/s mod n." *Id*. "The components (r, s) are used by the signer as the signature of the message, M, and sent with the message to the intended recipient." *Id*.

79. The process for verifying a digital signature created using ECDSA includes, among others, the following steps. "First the verifier computes an integer e=h(M) mod n from the received message." Ex. 1 at 2:64-3:4. "Then the verifier computes integers u and v such that u=e/s mod n and v=r/s mod n." *Id*. "Next, the verifier computes a value corresponding to the point R that is

obtained by adding uG+vQ. This has co-ordinates (x, y)." *Id*. "Finally the verifier converts the field element x to an integer x' and checks that r=x' mod n. If it does the signature is verified." *Id*.

80. The inventors recognized technological problems associated with the above-described ECDSA signature verification process and invented ways to improve it. For example, the inventors recognized that "the verification of an ECDSA signature appears to take twice as long as the creation of an ECDSA signature, because the verification process involves two scalar multiplications, namely uG and vQ, whereas signing involves only one scalar multiplication, namely kG." Ex. 1 at 3:5–17. The inventors further recognized that "[e]lliptic curve scalar multiplications consume most of the time of these processes, so twice as many of them essentially doubles the computation time." *Id*. And, while some "[m]ethods are known for computing uG+vQ that takes less time than computing uG and v[Q] separately," the inventors recognized that such methods nevertheless "mean that computing uG+vQ can take 1.5 times as long as computing kG." *Id*.

81. Accelerating elliptic curve computations (reducing computing time) is a technological problem for which the inventors discovered technological solutions. Accelerating elliptic curve computations requires the use of additional computer resources, such as memory and processing capabilities. *See* Ex. 1 at 3:18-4:14. However, known techniques for accelerating elliptic curve computations provided limited overall benefits to the overall computer architecture because the ability to achieve faster operations came at the significant cost of more memory and potentially wasteful pre-computation processing cycles. *Id*. The inventors recognized that "these costs may accumulate to the point that any benefit of faster computation is offset by the need to store or communicate" more pre-computed data. Moreover, "[t]he net benefit depends on the relative cost of time, memory and bandwidth, which can vary tremendously between

implementations and systems." *Id*. Accordingly, achieving such benefits required case-by-case optimizations of parameters to strike a balance between an achievable increase in speed with increases in computational and memory costs. *See id*.

82. The inventors taught improvements to the ECDSA digital signature verification process. Ex. 1 at 4:15-33. For example, the '197 Patent teaches techniques that enable accelerated signature verification, which include, among other things, generating, for use with a digital signature (*e.g.*, a signature with components (r, s)), an indicator (*e.g.*, i) to identify which value of a plurality of values (*e.g.*, for a point with coordinates (x, y)) recoverable from the first signature component (*e.g.*, r of the pair (r, s)) is an ephemeral public key (*e.g.*, R). *See*, *e.g.*, Ex. 1 at 5:23-31, 6:37–7:38, 9:44-46, 10:61–11:5, 12:11–59, 15:29–33. The '197 Patent teaches that such techniques accelerate the recovery of, for example, an ephemeral public key (*e.g.*, R) for verifying digital signatures (thereby also accelerating digital signature verification), which provide a technological improvement. *See*, *e.g.*, *id*.

83. The '197 Patent also teaches techniques that enable accelerated digital signature verification, which include, among other things, recovering (or generating) a signer's public key (*e.g.*, Q) from the digital signature of a message, where doing so includes computing Q as $r^{-1}(sR-eG)$ using components of the digital signature (rather than sending Q in the message or retrieving it elsewhere), where G comprises a generator of an elliptic curve group that includes a first elliptic curve point R and the second elliptic curve point Q. *See*, *e.g.*, Ex. 1 at 4:48-5:4; 7:39–58, 8:12–9:31, 9:67–10:34, 12:43–59, 13:1–26, 15:15–40. The '197 Patent teaches that such techniques reduce bandwidth and storage and accelerate the verification of digital signatures, allowing more digital signatures to be verified in a given amount of time, which provide technological improvements over preexisting techniques. *See*, *e.g.*, *id*.

84. Accordingly, the '197 Patent claims, among other things, a method of generating a digital signature of a message comprising, by operation of a cryptographic module comprising one or more processors, generating a digital signature comprising a first signature component and a second signature component, where the first signature component is based on a first coordinate of an elliptic curve point representing an ephemeral public key; generating an indicator to identify which of a plurality of values recoverable from the first signature component is the ephemeral public key; and sending the digital signature and the indicator to a verifier. *See* Ex. 1 at claim 1.

**<u>The "Improved Modular Reduction" Patent ('286)</u>**

85. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

86. The '286 Patent, entitled "System and Method for Reducing the Computation and Storage Requirements for a Montgomery-Style Reduction," was duly and lawfully issued on September 10, 2013. A true and correct copy of the '286 Patent is attached hereto as Exhibit 2. The application for the '286 Patent was filed on July 19, 2010, and claims the benefit of priority of Provisional App. No. 61/226,427, filed on July 17, 2009.

87. The '286 Patent has been and continues to be in full force and effect since its issuance. Malikie owns by assignment the entire right and title in and to the '286 Patent, including the right to seek damages for any infringement thereof.

88. The '286 Patent relates generally to systems and methods for reducing the computation and storage requirements for a Montgomery style reduction (a form of modular arithmetic). *See*, *e.g.*, Ex. 2 at 1:13–16; *see also id.*, Abstract.

89. The patent teaches that "[i]n cryptography, e.g. public key cryptography, operations such as multiplication or exponentiation of integers in some group $Z_n$, may be required, where modular arithmetic is used to operate on the integers." Ex. 2 at 1:20–30. "For example, to multiply

two numbers modulo some [number] n, the classical approach is to first perform the multiplication and then calculate the remainder."[136] *Id*. The patent teaches that "[a]lthough the classical approach is simple for basic operations such as in multi-precision calculations and does not require precomputation, the step of calculating the remainder is considered slow." *Id*. "The calculation of the remainder is referred to as reduction in modular arithmetic." *Id*.

90. The patent further teaches that "[i]n Montgomery reduction, calculations with respect to a modulus n are carried out with the aid of an auxiliary number R called the Montgomery radix or base." Ex. 2 at 1:47–64. For example, "[t]he Montgomery reduction of a number a with radix R and prime modulus n is the quantity given by $aR^{-1}$ mod n." *Id*.

91. "In a given cryptographic system," the patent teaches, "a computational engine may be used for calculating the Montgomery product of two numbers, this engine being sometimes referred to as a Montgomery engine or Montgomery machine." Ex. 2 at 1:65–2:13. The patent further teaches that "[t]he engine may be implemented in a hardware or software module and operates on a set of parameters to produce a result." *Id*. For example, using a Montgomery engine, "Montgomery multiplication may proceed as follows:

1. $c \leftarrow 0$, where c will hold the result $abR^{-1}$ mod n and $c = (c_k c_{k-1} \ldots c_1 c_0)$.

2. For i from 0 to (k-1) do the following:
2.1 $m \leftarrow (c_0 + a_i, b_o)\mu \bmod 2^w$; and
2.2 $c \leftarrow (c + a_i b + mn)/2^w$

3. If $c \geqq n$ then $c \leftarrow c - n$

4. Return (c)."

---

[136] The term "modulo" means to calculate the remainder after dividing one number by another. *See e.g.*https://www.mathsisfun.com/definitions/modulo-operation.html; *see also* https://en.wikipedia.org/wiki/Modulo ("In computing and mathematics, the modulo operation returns the remainder or signed remainder of a division, after one number is divided by another, the latter being called the modulus of the operation."

Ex. 2 at 2:14–33.

92. "In Montgomery reduction, the value μ is used to zero w least significant bits of a value a," whereby "[f]irst, a multiplier m=μa mod $2^w$ is computed," where "[t]he value m has at most w bits." Ex. 2 at 2:47–53. "Adding a+mn will zero w least significant bits of a, and a may be shifted down w bits." *Id*. "Since typically L=kw, where k is the number of w-bit words in R[,] this operation is repeated k times to effect the Montgomery reduction $aR^{-1}$ mod n." *Id*.

93. The patent teaches that "efficiency may be increased by pre-computing certain fixed values to be used in the calculations," where "[s]uch values include $\mu=(-n)^{-1}$ mod $2^w$, for some w typically being the bit size of a word (or block) of the value (or perhaps the entire value) being operated on; and $R^2$ mod n." Ex. 2 at 2:34–46.

94. The patent further teaches that "[i]n a register-based processor, registers are typically used to hold components of the value to be reduced, namely the precomputed value μ and the modulus n." Ex. 2 at 2:59–61.

95. The inventors recognized these technological problems and discovered improvements in modular reduction engines for computers (e.g., Montgomery engines) to address them. *See*, *e.g.*, Ex. 2 at 3:21–45, 5:28–36, 3:40–45, 5:24–35, 5:45–6:19, 6:51–65.

96. For example, the patent teaches techniques for performing, on a cryptographic apparatus, a Montgomery-style reduction in a cryptographic operation that includes obtaining an operand for the cryptographic operation; computing a modified operand using a reduction value, instead of a modulus used in performing a standard Montgomery reduction, to perform a replacement of a least significant word of the operand, rather than perform a cancellation thereof, where the reduction value is a function of the modulus; and outputting the modified operand. *See*, *e.g.*, Ex. 2 at 4:40–6:65. The patent teaches that such inventive techniques can reduce the number

of multiplications and registers needed to effect the modular reduction, thereby providing a new and inventive technique for efficient modular reduction machines.[137] *See*, *e.g.*, *id*. at 3:40–42, 5:28–36, 6:2–19, 6:51–65. For example, the patent teaches that "[i]n a machine 22 that has a limited number of registers and/or computational capabilities, it is desirable to reduce both the number of stored values and the number of computations," and that "[t]o avoid having to store both μ and n, it has been recognized by the inventor that a modified reduction value or a logical shift or signed version of such a value can be used in place of μ and n for the bulk of the low-order reduction." *Id*. at 5:28–36. The patent also teaches that the inventive technique "avoids both the multiplication necessary to compute m and the storage required for μ" and that the modified reduction value "does not require more registers than would be needed" otherwise. *Id*. at 6:2–19. The patent further teaches that the inventors observed significant benefits of the inventive techniques when used, for example, to perform ECC operations using resource-constrained computer processor architectures (*e.g.*, "the popular ARM architecture"). *Id*. at 6:51–65.

**<u>The "Power Analysis Countermeasure" Patent ('557)</u>**

97. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

98. The '557 Patent, entitled "Power Analysis Attack Countermeasure for the ECDSA," was duly and lawfully issued on December 11, 2012. A true and correct copy of the '557 Patent is attached hereto as Exhibit 3. The application for the '557 Patent was filed on August 31, 2011, and claims the benefit of priority to earlier related applications, the earliest of which was filed on or about March 7, 2007.

---

[137] A register is hardware in a CPU for temporary storage of data during program execution. *See e.g.*https://techterms.com/definition/register; https://www.allaboutcircuits.com/video-lectures/internal-registers-alu/; https://gunkies.org/wiki/Register; https://www.theiotacademy.co/blog/registers-in-cpu/.

99. The ’557 Patent has been and continues to be in full force and effect since its issuance. Malikie owns by assignment the entire right and title in and to the ’557 Patent, including the right to seek damages for any infringement thereof.

100. The ’557 Patent relates generally to cryptography and, more specifically, to measures for countering power analysis attacks on a physical implementation of the Elliptic Curve Digital Signature Algorithm (ECDSA), including techniques that vary the order of the arithmetic operations in which a long-term cryptographic key is involved so as to mask the use of that key during signature generation. *See, e.g.*, Ex. 3 at 1:34-37, 2:52-58, 6:45-8:7; *see also id.*, Abstract.

101. The patent explains that execution of the ECDSA “requires determination of a signature,” the determination of which “involves arithmetic operations,” and that “[s]ome of the arithmetic operations employ a long term cryptographic key.” Ex. 3, Abstract. As the patent teaches, certain cryptosystem attacks are based not on “theoretical weaknesses in the algorithms,” but instead on “careful measurements of the physical implementation of a cryptosystem[,]” a category of attack known as a “side channel attack.” *Id.* at 4:9-14. Such attacks may exploit measurable qualities such as the “amount of time taken by known hardware to encrypt plaint text[,] … power consumption, electromagnetic leaks and [s]ound.” *Id.* at 4:14-20. The patent describes two such attacks in particular. In a Simple Power Analysis (SPA) attack, “an attacker monitors the power consumption of a device to visually identify large features of the scalar multiplication operation, kP,” and may thereby “recognize exact instructions as the instructions are executed” to reveal the bits of the private key. *Id.* at 4:28-45. In a Differential Power Analysis (DPA) attack, “an attacker exploits the varying power consumed by a microprocessor while the microprocessor executes cryptographic program code” and, “[u]sing statistical analysis of the power consumption measurements of many runs of a given cryptographic algorithm,” “may infer information about a

secret key." *Id.* at 4:46-52. "It is the execution of these arithmetic operations that can make the execution of the ECDSA vulnerable to a power analysis attack," by which an attacker "may determine the long term cryptographic key." *Id.*, Abstract.

102. The inventor recognized these technological problems and discovered solutions to address them. *See, e.g.*, Ex. 3 at 2:52-58, 6:45-8:7. The patent identifies the specific vulnerability: "an attacker, given knowledge of r, may determine the private key, d, using a DPA attack on the determination of s in step 112. That is, an attacker, given knowledge of r, may determine the private key, d, using a DPA attack on the modular multiplication of $d_A$ and r in equation." *Id.* at 6:4-11. The inventor taught that "[b]y modifying the sequence of operations involved in the determination of the signature and the inputs to those operations, power analysis attacks may no longer be applied to determine the long term cryptographic key." *Id.*, Abstract; *see also id.* at 6:45-52. For example, the patent teaches subjecting the modular multiplication of d and r to "multiplicative splitting" using a random "masking factor" ω, so that the exposed product is masked and "it is unnecessary for the processor to determine an intermediate value combining r with d." *Id.* at 6:53-7:32. In another aspect, the patent teaches rearranging the order of the operations used to obtain s so that the same protection is achieved with "only one additional modular multiplication operation" compared to the original ECDSA. *Id.* at 7:33-8:7. Consistent with these teachings, the '557 Patent claims a method of publishing a signature related to a message in a manner that counters power analysis attacks, comprising receiving the message, obtaining a hash of the message, selecting a random integer, obtaining a non-zero first element of the signature based on a base point and the random integer, and obtaining a non-zero second element of the signature based on the random integer, the hash, the first element, the private cryptographic key, and a modular inverse of the random integer—where obtaining the second element involves determining a first modular

multiplication product of the private cryptographic key and the modular inverse of the random integer, and determining a second modular multiplication product of that first product and a modular multiple of the first element, and publishing the first and second elements of the signature. *See, e.g.*, Ex. 3 at claim 1.

**The "Secure Link" Patent ('323)**

103. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

104. The '323 Patent, entitled "Securing a Link Between Two Devices," was duly and lawfully issued on September 22, 2015. A true and correct copy of the '323 Patent is attached hereto as Exhibit 4. The application for the '323 Patent was filed on April 4, 2005, as Application No. 11/097,144. The named inventors are Michael K. Brown, Herb Little, Michael S. Brown, Neil Adams, Michael McCallum, and Dinah Davis, who were researchers at Research In Motion Limited, now known as BlackBerry Limited.[138]

105. The '323 Patent has been and continues to be in full force and effect since its issuance. Malikie owns by assignment the entire right and title in and to the '323 Patent, including the right to seek damages for any infringement thereof.

106. The '323 Patent relates generally to securing a communication link between two devices that communicate over an untrusted network. *See, e.g.*, Ex. 4, Abstract; *id.* at 1:15–45. The patent explains that communications between two devices "may be insecure and vulnerable to attacks," and that cryptographic techniques may be employed to secure such a link. *See id.* Where the two devices rely on a symmetric key, "a single, common cryptographic key is stored by two communication devices"; where they rely on a public-key system, "each communication

[138] *See* https://patents.google.com/patent/US9143323B2/en (listing inventors Michael K. Brown, Herb Little, Michael S. Brown, Neil Adams, Michael McCallum, and Dinah Davis; original assignee Research In Motion Limited; current assignee Malikie Innovations Ltd.).

device stores its own private key and freely distributes its own public key." *Id.* In either case, secrets "need to be shared between the two communication devices in a secure and authenticated manner." *Id.*

107. The inventors recognized technological problems in establishing such a shared key over an insecure link—including the risk that an attacker positioned between the two devices could tamper with the messages exchanged during the key-establishment process, or could substitute its own messages, without detection by either device. *See, e.g.*, Ex. 4 at 1:15–45, 3:30–4:20.

108. The '323 Patent teaches technological solutions to those problems. Among other things, the patent teaches deriving the key that ultimately secures the link not from a single key exchange, but from a combination of two separately generated cryptographic keys together with a hash computed over the packets the two devices actually exchanged while generating those keys. *See, e.g.*, Ex. 4, Abstract; *id.* at claim 1. Because the resulting key depends on the entire record of the handshake, any tampering with, or substitution of, the packets exchanged between the two devices produces a different hash result at each device, the derived keys do not match, and the attack is detected rather than silently succeeding. *See id.*

109. Accordingly, the '323 Patent claims, among other things, a method for securing a communication link between a first device and a second device comprising generating a first cryptographic key; generating a second cryptographic key; hashing packets communicated between the first device and the second device over the communication link to create a hash result; and hashing the first cryptographic key, the second cryptographic key, and the hash result to generate a third cryptographic key to be used to secure the communication link. *See* Ex. 4 at claim 1. These techniques are the architecture on which modern secured-channel protocols rest, including the Transport Layer Security protocol, which derives the keys that protect a link from

previously generated secrets combined with a hash computed over the handshake messages exchanged between the two endpoints.[139]

**JURISDICTION AND VENUE**

110. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

111. This civil action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285. This is a patent infringement lawsuit over which this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1332, and 1338(a).

112. This Court has general and specific personal jurisdiction over each Defendant because, directly or through intermediaries, each Defendant has committed acts within this District giving rise to this action; is present in and transacts and conducts business, directly and/or indirectly, in this District and the State of Texas; and transacts and conducts business with residents of this District and the State of Texas. Foris DAX maintains its principal place of business and North America headquarters in Tyler, Texas, in this District, and has itself invoked this District as its home forum.

113. Plaintiffs' causes of action arise, at least in part, from each Defendant's contacts with and activities directed at the United States, the State of Texas, and this District. On information and belief, Defendants own, operate, and control the Crypto.com platform, including the website located at https://crypto.com/, the Crypto.com Exchange, and the Crypto.com mobile applications, through which Defendants offer and provide cryptocurrency exchange, trading, custody, wallet, and payment services to users located throughout the United States, including in

[139] *See* https://www.rfc-editor.org/info/rfc9846/ (RFC 9846 § 7.1) (key schedule deriving handshake and traffic secrets from a previously derived secret together with the transcript hash of the handshake messages).

the State of Texas and this District. Crypto.com states that the Crypto.com App "is currently available in 49 states in the United States of America & US Territories, including . . . Texas." On information and belief, Defendants maintain and operate server infrastructure in the United States through which those services are delivered to users located in the United States, including in the State of Texas and this District.

114. Defendants have infringed the Asserted Patents within this District and the State of Texas by making, using, selling, offering for sale, and/or importing or by having made, used, sold, offered for sale, and/or imported in or into this District and elsewhere in the State of Texas, products and services covered by claims in the Asserted Patents, including without limitation products that, when made or used, practice the claimed methods of the Asserted Patents. Defendants, directly and through intermediaries, have and continue to make, use, sell, offer for sale, import, ship, distribute, advertise, promote, and/or otherwise commercialize such infringing products and services in or into this District and the State of Texas. Defendants regularly conduct and solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from goods and services provided to residents of this District and the State of Texas.

115. This Court has personal jurisdiction over each Defendant pursuant to Tex. Civ. Prac. & Rem. Code § 17.041 et seq.

116. Venue is proper in this District as to Defendant Foris DAX under 28 U.S.C. § 1400(b). Foris DAX is a domestic corporation and resides in this District: its principal place of business and North America headquarters is at 110 N. College Avenue, Suite 500, Tyler, Texas 75702, and Foris DAX has itself pleaded in this District and Division that it "is a corporation organized under the laws of the state of Delaware, with its headquarters in Tyler, Texas." Foris DAX also has a regular and established place of business in this District at that address, from which

it conducts its North America operations and at which it employs personnel, and it has committed acts of infringement in this District.

117. Venue is proper in this District as to Defendants Foris DAX Asia and Foris Holdings under 28 U.S.C. § 1391(b) and (c). On information and belief, Foris DAX Asia is organized under the laws of the Republic of Singapore and Foris Holdings is organized under the laws of the Cayman Islands, and neither is a resident of any judicial district within the United States. Under 28 U.S.C. § 1391(c)(3), "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." Venue over each of Foris DAX Asia and Foris Holdings is therefore proper in this District. *See In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018) (holding that the alien-venue rule of § 1391(c)(3) survives *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 581 U.S. 258 (2017)).

118. This action is properly assigned to the Tyler Division of this District because Foris DAX resides and maintains its regular and established place of business in Tyler, Smith County, Texas, and because a substantial part of the events giving rise to Plaintiffs' claims occurred there.

## **FIRST CLAIM**

### **(Infringement of the '197 Patent)**

119. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

120. The '197 Patent is generally directed to improved computational techniques for use in cryptographic algorithms, and, in particular, to methods and apparatuses for generating a digital signature of a message, the digital signature having first and second signature components, where the first is based on a first coordinate of an elliptic curve point representing an ephemeral public

key, and generating an indicator to identify which value of multiple values recoverable from the first signature component is the ephemeral public key.

121. Crypto.com has been on notice of the '197 Patent and a specific factual basis for its infringement of the '197 Patent since at least July 25, 2025. On information and belief, Defendants did not take any action to stop their infringement.

122. Defendants have, under 35 U.S.C. § 271(a), directly infringed, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '197 Patent, by having made, used, tested, sold, offered for sale, and/or imported hardware and/or software (excluding any products licensed under the '197 Patent), including the Accused Instrumentalities, including the Crypto.com App, the Crypto.com Exchange and Crypto.com Exchange app, the Crypto.com Onchain (formerly DeFi Wallet) app, the Crypto.com Pay for Business app, Crypto.com's servers, Crypto.com's stablecoin settlement systems, and the Crypto.com Cronos POS Chain, Cronos EVM, and Cronos zkEVM Bridge, together with the devices and software Crypto.com uses to sign, send, transfer, transmit, spend, or verify cryptocurrency and stablecoin transactions (including computers, nodes, servers, applications, programs, and wallets and their associated processors, such as a digital wallet, a hot wallet, a cold wallet, a warm wallet, a hardware wallet, a hardware security module (HSM), or an embedded device). An exemplary claim chart showing one way in which Crypto.com infringes at least claim 1 of the '197 Patent is attached as Exhibit 5.

123. Defendants' past infringement has been willful in view of the above and their failure to take any action, even after being put on notice, to stop their infringement.

**SECOND CLAIM**

**(Infringement of the '286 Patent)**

124. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

125. The '286 Patent is generally directed to systems and methods for reducing the computation and storage requirements for a Montgomery-style reduction and, in particular, to techniques for performing, on a cryptographic apparatus, a Montgomery-style reduction in a cryptographic operation that includes obtaining an operand for the cryptographic operation; computing a modified operand using a reduction value, instead of a modulus used in performing a standard Montgomery reduction, to perform a replacement of a least significant word of the operand, rather than perform a cancellation thereof, where the reduction value is a function of the modulus; and outputting the modified operand.

126. Crypto.com has been on notice of the '286 Patent and a specific factual basis for its infringement of the '286 Patent since at least July 25, 2025. On information and belief, Defendants have not taken any action to stop their infringement.

127. Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '286 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software (excluding any products licensed under the '286 Patent), including the Accused Instrumentalities, including the Crypto.com App, the Crypto.com Exchange and Crypto.com Exchange app, the Crypto.com Onchain (formerly DeFi Wallet) app, the Crypto.com Pay for Business app, Crypto.com's servers, Crypto.com's stablecoin settlement systems, and the Crypto.com Cronos POS Chain, Cronos EVM, and Cronos zkEVM Bridge, together with the devices and software Crypto.com uses to sign, send, transfer, transmit,

spend, or verify cryptocurrency and stablecoin transactions (including computers, nodes, servers, applications, programs, and wallets and their associated processors, such as a digital wallet, a hot wallet, a cold wallet, a warm wallet, a hardware wallet, a hardware security module (HSM), or an embedded device). An exemplary claim chart showing one way in which Crypto.com infringes at least claim 1 of the ’286 Patent is attached as Exhibit 6.

128. Defendants’ infringement has been willful in view of the above and their failure to take any action, even after being put on notice, to stop their infringement.

**THIRD CLAIM**

**(Infringement of the ’557 Patent)**

129. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

130. The ’557 Patent is generally directed to countermeasures against power analysis attacks in the generation of digital signatures using the Elliptic Curve Digital Signature Algorithm (ECDSA), and, in particular, to methods of publishing a signature related to a message in a manner that counters power analysis attacks, including by obtaining a hash of the message, selecting a random integer, obtaining a first signature element based on a base point and the random integer, obtaining a second signature element based on the random integer, the hash, the first element, a private cryptographic key, and a modular inverse of the random integer, and publishing the signature elements.

131. Crypto.com has been on notice of the ’557 Patent and a specific factual basis for its infringement of the ’557 Patent since at least the filing of this Complaint. On information and belief, Defendants have not taken any action to stop their infringement.

132. Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including

without limitation at least claim 1 of the '557 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software (excluding any products licensed under the '557 Patent), including the Accused Instrumentalities, including the Crypto.com App, the Crypto.com Exchange and Crypto.com Exchange app, the Crypto.com Onchain (formerly DeFi Wallet) app, the Crypto.com Pay for Business app, Crypto.com's servers, Crypto.com's stablecoin settlement systems, and the Crypto.com Cronos POS Chain, Cronos EVM, and Cronos zkEVM Bridge, together with the devices and software Crypto.com uses to sign, send, transfer, transmit, spend, or verify cryptocurrency and stablecoin transactions (including computers, nodes, servers, applications, programs, and wallets and their associated processors, such as a digital wallet, a hot wallet, a cold wallet, a warm wallet, a hardware wallet, a hardware security module (HSM), or an embedded device). An exemplary claim chart showing one way in which Crypto.com infringes at least claim 1 of the '557 Patent is attached as Exhibit 7.

**FOURTH CLAIM**

**(Infringement of the '323 Patent)**

133. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

134. The '323 Patent is generally directed to securing a communication link between two devices and, in particular, to methods, devices, and systems for securing such a link by generating a first cryptographic key, generating a second cryptographic key, hashing packets communicated between the first device and the second device over the communication link to create a hash result, and hashing the first cryptographic key, the second cryptographic key, and the hash result to generate a third cryptographic key to be used to secure the communication link. *See* Ex. 4 at claim 1.

135. Crypto.com has been on notice of the ’323 Patent and a specific factual basis for its infringement of the ’323 Patent since at least the filing of this Complaint. On information and belief, Defendants have not taken any action to stop their infringement.

136. Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the ’323 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software (excluding any products licensed under the ’323 Patent), including hardware and/or software that establishes and secures communication links between two devices, including without limitation Crypto.com’s servers—among them the servers that terminate the Transport Layer Security connections established with the phones, computers, and servers of Crypto.com’s users, institutional customers, and market makers, the servers hosting Crypto.com’s website and its REST, WebSocket, and FIX application programming interfaces, and the servers supporting the Crypto.com App, the Crypto.com Exchange, the Crypto.com Onchain app, the Crypto.com Pay for Business app, and the Cronos POS Chain, Cronos EVM, and Cronos zkEVM Bridge. An exemplary claim chart showing one way in which Crypto.com infringes at least claim 1 of the ’323 Patent is attached as Exhibit 8.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

137. That Defendants have infringed the Asserted Patents and will continue to infringe the ’286 Patent, ’557 Patent, and ’323 Patent unless enjoined;

138. That Defendants’ infringement of the ’197 Patent and ’286 Patent has been willful;

139. That Defendants pay Plaintiffs damages adequate to compensate for their past infringement of each of the Asserted Patents as appropriate, and present and future infringement

of the'286 Patent, '557 Patent, and '323 Patent as appropriate, together with interest and costs under 35 U.S.C. § 284;

140. That Defendants pay prejudgment and post-judgment interest on the damages assessed;

141. That Defendants pay Plaintiffs enhanced damages pursuant to 35 U.S.C. § 284;

142. That Defendants be enjoined from infringing the'286 Patent, '557 Patent, and '323 Patent as appropriate or, if their infringement is not enjoined, that they be ordered to pay ongoing royalties to Plaintiffs for any post-judgment infringement of the'286 Patent, '557 Patent, and '323 Patent as appropriate;

143. That this is an exceptional case under 35 U.S.C. § 285, and that Defendants pay Plaintiffs' attorneys' fees and costs in this action; and

144. That Plaintiffs be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

Dated: September 22, 2026

Respectfully submitted,

*/s/ Khue V. Hoang by permission Claire Abernathy Henry*
Khue V. Hoang – LEAD ATTORNEY
**Reichman Jorgensen Lehman & Feldberg LLP**
650 Fifth Avenue, Suite 2320
New York, NY 10019
Tel: (212) 381-1965
khoang@reichmanjorgensen.com

Matthew G. Berkowitz
Michael Polka
Michael Caulkins
**Reichman Jorgensen Lehman & Feldberg LLP**
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
mberkowitz@reichmanjorgensen.com
mpolka@reichmanjorgensen.com
mcaulkins@reichmanjorgensen.com

Philip J. Eklem (*pro hac vice forthcoming*)
**Reichman Jorgensen Lehman & Feldberg LLP**
1909 K Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 894-7310
peklem@reichmanjorgensen.com

Vivek P. Shankam (*pro hac vice forthcoming*)
**Reichman Jorgensen Lehman & Feldberg LLP**
901 S. MoPac Expressway, Bldg. 1, Suite 270
Austin, TX 78746
Tel: (737) 227-3117
vshankam@reichmanjorgensen.com

*Attorneys for Plaintiffs Malikie Innovations Ltd. and Key Patent Innovations Ltd.*

*Of Counsel*:

Claire Abernathy Henry
Texas State Bar No. 24053063
**Miller Fair Henry PLLC**
1507 Bill Owens Pkwy.
Longview, TX 75604
Tel: (903) 757-6400
claire@millerfairhenry.com